# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 21-0637V

| | |
|---|---|
| ELIZABETH MACKENZIE,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: April 30, 2024 |

*Jessi Carin Huff, Maglio Christopher & Toale, PA, Seattle, WA, for Petitioner.*

*Mary Eileen Holmes, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION[1]

On January 12, 2021, Elizabeth Mackenzie filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on October 23, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons discussed below, I find that Petitioner has not established by a preponderance of the evidence that she experienced the residual effects of her injury for more than six months, or otherwise satisfied the statutory severity requirement, and therefore the claim must be dismissed.

## I.   Relevant Procedural History

Over a year after the case was activated, Respondent determined that he would defend this case and filed his Rule 4(c) Report (ECF No. 26). Petitioner filed a motion for a ruling on the record, along with additional evidence, on April 10, 2023 (ECF No. 28), to which Respondent responded (ECF No. 29). The issue of Petitioner's entitlement to compensation is now ripe for resolution.

## II.   Relevant Factual History

### A.  Medical Records

#### 1.  Prior to Vaccination

Petitioner had a pre-vaccination history of lower back and bilateral leg pain, right knee arthritis, spinal stenosis, lumbar disc degeneration, radiculopathy of the lumbar spine, cardiovascular disease, and tinnitus. Ex. 8 at 54; Exs. 9; 10; 12. On February 11, 2015, she saw her primary care physician ("PCP") Dr. Santos Soberon, complaining of shortness of breath and episodic arm pain. Ex. 7 at 143. She explained that "this happened a [couple] of weeks ago but didn't really think much about it until a friend warned her this maybe more." *Id.* Dr. Soberon's examination did not include a musculoskeletal or extremity component. *Id.* at 143-44. He referred her to a cardiologist for evaluation and treatment. *Id.* at 144.

On March 31, 2015, she saw cardiologist Dr. R. Leldon Sweet as a new patient. Ex. 7 at 96. She reported chest pain and edema that had improved, as well as palpitations and occasional arm and chest discomfort, without associated shortness of breath but with significant problems with dependent edema. *Id.* On examination, she had no joint tenderness. *Id.* at 98. The record does not state which arm was painful and has no further mention of arm problems. *Id.* Petitioner saw Dr. Curtis Thorpe and Dr. Juan Davila of Beaumont Bone and Joint Institute for right knee arthritis and bilateral leg pain several

times prior to vaccination, without mention of arm or shoulder problems. Ex. 3 at 16, 18, 20.

On January 25, 2019, Petitioner saw neurosurgeon Dr. Peng Chen for tinnitus. Ex. 12 at 51. She reported no arm pain, numbness, or weakness. *Id.* at 63. On July 8, 2019, she saw Dr. Chen and reported joint swelling and arthritis, without specifying which joints were affected. *Id.* at 89, 90. On examination, her extremities had full range of motion. On July 18, 2019, she saw Dr. Thorpe for right knee arthritis. Ex. 3 at 14. She reported no other joint pain, muscle weakness, or pain. *Id.* at 15.

## 2. October 23, 2019 Vaccination and Thereafter

On October 23, 2019, at the age of 78, Petitioner received a flu vaccine in her left deltoid at CVS Pharmacy. Ex. 2 at 3. Eight days later (October 31, 2019), she saw cardiologist Dr. Sweet for a hypertension checkup. Ex. 4 at 7. A musculoskeletal examination recorded no chest wall or joint tenderness. *Id.* at 8. The record does not mention left shoulder pain.

On December 10, 2019 (48 days after vaccination), Petitioner saw her PCP Dr. Soberon for a six month follow up. Ex. 7 at 160. She complained that her arm was sore from the October vaccination. *Id.* An examination of her extremities revealed no significant edema or clubbing, and her musculoskeletal examination was unremarkable. *Id.* She was assessed with bursitis of the left shoulder, and a steroid injection was administered. *Id.*

Petitioner returned to Dr. Soberon a month and a half later (January 29, 2020), again complaining of left arm and shoulder pain since her October flu vaccination. Ex. 7 at 158. She was referred to an orthopedist. *Id.*

Five days later (February 3, 2020), Petitioner saw orthopedist Dr. Thorpe, who she had previously seen for leg and knee problems. Ex. 3 at 11. She complained of left shoulder pain "for about 3 to 4 months." *Id.* The cortisone shot Dr. Soberon administered had not provided much relief, and she had pain with activity and at nighttime. *Id.* Her x-rays showed advanced glenohumeral joint arthritis and a large subacromial spur. *Id.* at 12. On examination, she had pain with elevation past 90 degrees and positive results with pain on the Hawkins and O'Brien's tests. *Id.* Dr. Thorpe administered another steroid injection and ordered an MRI. *Id.*

Instead of an MRI, Petitioner had a CT scan and arthrogram of her left shoulder. Ex. 3 at 24. The CT scan showed a subtotal/total full-thickness tear of the supraspinatus tendon insertion, with tendon retraction; subscapularis tendinosis; and severe glenohumeral osteoarthritis with bone on bone. *Id.*

Petitioner returned to Dr. Thorpe on March 10, 2020 to review her CT scan. Ex. 3 at 8. After reviewing the scan, Dr. Thorpe told Petitioner that the only surgery that was

likely to help would be a total shoulder replacement, which he did not recommend. *Id.* He showed her some exercises and advised her to return as needed. *Id.* The record does not indicate that Petitioner reported shoulder pain or other symptoms. *Id.*

Petitioner thereafter saw Dr. Soberon on June 4, August 11, and October 2, 2020, but made no mention of problems with her left shoulder. Ex. 7 at 152, 153, 155. She also saw Dr. Sweet on July 16, 2020, for a follow up for her hypertension, with no mention of her left shoulder. Ex. 4 at 4. And she was seen at a spine clinic for back and leg pain five times between October and December 2020, without mention of left shoulder problems. Ex. 9 at 3, 5, 7, 9, 13.

On February 1, 2021 – after this petition was filed, and almost a year from the time she last complained of shoulder-related issues – Petitioner returned to Dr. Soberon stating she would like to return to her orthopedist for left arm pain. Ex. 18 at 24. Dr. Soberon prescribed a muscle relaxant and ordered a venous Doppler study, which ruled out deep vein thrombosis. *Id.* at 7, 24.

The following month (March 4, 2021), Petitioner saw Dr. Thorpe for left shoulder pain. Ex. 17 at 5. Dr. Thorpe stated that the cortisone shot she had in February 2020 had "lasted until now." *Id.* However, he noted that she "ha[d] been overdoing it because of this storm clean up that we have recently had." *Id.* On examination, she had limited forward flexion. *Id.* at 6. He assessed her with end stage cuff arthropathy. *Id.* He administered yet another steroid injection in her left shoulder. *Id.* at 7.

Seven months later (October 5, 2021), Petitioner returned to Dr. Thorpe for left shoulder pain. Ex. 21 at 12. Her shoulder had "[f]airly good" range of motion. *Id.* at 13. Dr. Thorpe administered steroid injections in her left shoulder and right knee. *Id.*

On January 17, 2022, Petitioner saw orthopedist Dr. Shawn Figari for left shoulder pain. Ex. 21 at 7. Her shoulder pain was affecting her quality of life and she was considering surgical correction. *Id.* Dr. Figari explained operative and conservative measures, and Petitioner decided to proceed with surgery. *Id.* at 8. She underwent left shoulder surgery on March 8, 2022. Ex. 23 at 465.

**B. Declarations**

Petitioner submitted two declarations in support of her claim. Exs. 11, 25. She states that the October 2019 flu vaccination was "instantly painful." Ex. 25 at ¶ 1. Before this time, she "never had any shoulder pain or issues with range of motion in [her] shoulder." *Id.* at ¶ 2. She does not complain much, and thought the pain would go away. *Id.* at ¶ 5. When it did not, she realized she needed to seek care. *Id.*

Petitioner states that during her visit to Dr. Sweet, she mentioned her shoulder pain to the nurse.[3] Ex. 25 at ¶ 6. The nurse told her it was normal for it to hurt for a couple of weeks. *Id.* She listened to the nurse and believed her pain was normal. *Id.*

The first cortisone shot she received from Dr. Soberon in December 2019 did not help with her shoulder pain. Ex. 25 at ¶ 8. But the second cortisone shot, given by Dr. Thorpe in February 2020, "provided a lot of relief." *Id.* at ¶ 10. After her CT scan,[4] Dr. Thorpe advised that there was not much more he could do for her, as he did not recommend surgery. *Id.* at ¶ 11. Thus, he gave her exercises to do at home, and sent her on her way. *Id.*

By February 2021, the cortisone shot had "well worn off" and she was still in pain. Ex. 25 at ¶ 12. When she returned to Dr. Thorpe in March 2021, she "did not report to Dr. Thorpe that I had over done it in recent storm clean up as that is not true." *Id.* at ¶ 13

### III.   Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Human Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25,

---

[3] Although Petitioner references a December 5, 2019 visit, it appears from the record that she means her October 31, 2019 appointment.

[4] Although Petitioner refers to an MRI, it appears she is referring to the shoulder CT scan.

1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014) (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[5] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

---

[5] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at \*4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at \*3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at \*5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark).

Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*


IV.    **Parties' Arguments**

   A. **Severity Requirement**

Respondent argues that Petitioner has not established that her injury lasted more than six months, and thus has not satisfied the statutory severity requirement. Respondent's Response to Petitioner's Motion, filed June 12, 2023, at *5-7 (ECF No. 29) ("Resp."). When Petitioner saw Dr. Thorpe less than five months after vaccination, he did not attribute any of her left shoulder symptoms to vaccination. *Id.* at *6. Thereafter, she continued seeing other health care providers for other issues, but did not again seek care for left shoulder pain for another eleven months. *Id.* And when she returned to Dr. Thorpe in March 2021 reporting left shoulder pain, she attributed it to "over doing it," not her October 2019 vaccination. *Id.* Thus, Respondent argues that "[t]here is no evidence that petitioner's shoulder pain presentation in 2021 is related to her alleged 2019 vaccine injury." *Id.* at *6-7.

Petitioner maintains that the medical records and supporting declarations show ongoing sequelae lasting longer than six months. Petitioner's Motion for Findings of Fact and Conclusions of Law, filed April 10, 2023, at *15 (ECF No. 28) ("Mot."). She acknowledges that there was a lengthy treatment gap, but argues that "a gap in treatment does not magically cut off connection to the injury absent any evidence whatsoever in the record to support [the] existence of another injury." *Id.* Petitioner adds that although the March 2021 medical record attributes the return of her symptoms to overdoing it during recent storm clean up, the "weather report leading up to this particular visit showed a very mild January with 21 days of sun or partial sun and zero storms occurring," citing Exhibit 26. *Id.* at 14.

### B. SIRVA Requirements

In addition to the severity objection, Respondent asserts that Petitioner has not satisfied two SIRVA QAI criteria. First, he argues that the onset of her shoulder pain has not been shown to have begun within 48 hours of vaccination. Resp. at *8. Second, he notes that her "history of severe osteoarthritis and evidence of such in her left shoulder prevents her from meeting the QAI due to 'other condition or abnormality' . . . and indicates a pre-existing inflammation or dysfunction that would explain her post-vaccination diagnostic findings" as well as her left shoulder pain. *Id.* at *8-9. Respondent adds that Petitioner's complaints of left shoulder pain "mirror her ongoing complaints of bilateral knee pain due to end stage osteoarthritis." *Id.* at *9. Although acknowledging that I have ruled that evidence of pre-existing arthritis does not preclude a SIRVA claim (*Werning v. Sec'y of Health & Human Servs.*, No. 18-0267V, 2020 WL 5151154, at *11 (Fed. Cl. Spec. Mstr. July 27, 2020)), "Petitioner's diagnostic testing shows a much more severe abnormality than common, age-related degenerative changes." *Id.* at *10.

In response, Petitioner contends that she felt "immediate pain that did not subside" from her October 2019 flu vaccination. Mot. at *10. When she saw her cardiologist eight days later, she did raise the issue with the nurse, and was told it was normal. *Id.* at *11. Petitioner adds that it is "less likely that a person would report vaccine injury related pain to a Cardiologist," and "the absence of such a conversation does not negate the existence of the injury." *Id.* Moreover, when she did seek care for her shoulder pain, she consistently and continuously referred the pain back to her October 2019 vaccination. *Id.* at *11-12.

Petitioner states that although she has a history of knee arthritis, "there are zero medical records showing any problem with her shoulder prior to the vaccine injury on October 23, 2019." Mot. at *13. Thus, although she may have had arthritis in her left shoulder, it did not cause any pain prior to vaccination. *Id.*

V.    **Analysis**

After a careful review of the record, I find that Petitioner has not established that the statutory severity requirement is satisfied. This alone is ground for the claim's dismissal.

Petitioner first sought care for left shoulder pain one and a half months after vaccination, on December 10, 2019. Thereafter, she continued to report symptoms until February 3, 2020. Ex. 3 at 11. On February 3, 2020, she saw orthopedist Dr. Thorpe complaining of left shoulder pain with activity and at nighttime. *Id.* On examination, she had pain with elevation and positive results with pain on the Hawkins and O'Brien's tests. *Id.* at 12. Dr. Thorpe administered a steroid injection.

Petitioner then had a shoulder CT scan and arthrogram, and followed up with Dr. Thorpe to review the results on March 10, 2020. Ex. 3 at 8. However, this record is absent of any report of shoulder symptoms or pain. *Id.* The record notes the results of the scan and Dr. Thorpe's thoughts on surgery, but is silent on any problems or pain Petitioner was experiencing. Thus, the last record showing that Petitioner remained symptomatic is the February 3, 2020 record – less than three and a half months after vaccination.

For the following year, Petitioner continued seeking medical attention for other concerns – but not for her left shoulder. Significantly, she did not again report left shoulder pain until February 2021 – a full *year* after her last recorded symptoms. Ex. 18 at 24. At that appointment, she did not relate her shoulder pain to her flu vaccination, and Dr. Soberon ordered a venous Doppler study to rule out deep vein thrombosis – suggesting that he did not view her symptoms as musculoskeletal in nature. And when she returned to Dr. Thorpe in March 2021, she attributed her left shoulder pain to "overdoing it because of this storm clean up that we have recently had." Ex. 17 at 5. Petitioner argues that she did *not* attribute her pain to storm clean up, and has filed a weather report as Exhibit 26, alleging that it shows "a very mild January with 21 days of sun or partial sun and zero storms occurring." Mot. at *14. However, I do not find a clear and sunny weather report for January 2021, combined with Petitioner's declaration, to be sufficient to overcome a medical record *two months later* that specifically attributes Petitioner's symptoms to overdoing it with storm cleanup.

In some cases, I have found the severity requirement met where a petitioner has received a steroid injection shortly before the six month mark and then does not seek care for several months thereafter – suggesting no need for care until the ameliorative effects of this treatment have worn off. *See, e.g., Reynolds v. Sec'y of Health & Human Servs.*, No. 19-1473V, 2023 WL 4505208, at *5 (Fed. Cl. Spec. Mstr. June 12, 2023) (finding severity requirement met where the petitioner had a four month gap in treatment

after a steroid injection, then returned to care reporting a *return* of her SIRVA-related pain after vigorous cleaning); *Cross v. Sec'y of Health & Human Servs.*, No. 19-1958V, 2023 WL 120783, at *5 (Fed. Cl. Spec. Mstr. Jan. 6, 2023) (finding severity requirement met where the petitioner received a steroid injection and then did not seek care again for six months, stating that the "six-month gap in Petitioner's treatment for her shoulder is at least partially explained by the fact that she received a cortisone injection on October 22, 2018, for her shoulder pain, which subsequently provided significant relief for a period of time").

But Ms. Mackenzie's situation is not comparable. In this case, the records do not show any documented symptoms for *a year* after her February 2020 steroid injection. And when she did again report symptoms, she did not report them as being similar to her previous left shoulder problems, attributing them instead to physical overuse. This is more like cases where I have found the statutory severity requirement *not* to be met. *See, e.g., Black v. Sec'y of Health & Human Servs.*, No. 21-09V, 2023 WL 4446500 (Fed. Cl. Spec. Mstr. May 22, 2023) (finding severity requirement not met and dismissing case where Petitioner received a steroid injection in his shoulder and, other than an MRI the following month, did not seek additional care for his shoulder pain until over eighteen months later – and only after the petition had been filed and Respondent had raised the question whether the severity requirement was met); *Francis v. Sec'y of Health & Human Servs.*, No. 20-780V, 2023 WL 146481, at *5 (Fed. Cl. Spec. Mstr. Dec. 5, 2022) (dismissing case for failure to meet severity requirement where there were two treatment gaps, including a five month gap spanning the relevant six month period during which the petitioner sought care for another health condition, followed by an 11 month gap).

Thus, in this case a preponderance of the evidence suggests that the February 2020 steroid injection resolved Petitioner's injury, and that her shoulder pain in February 2021 was unrelated to her vaccine injury. As a result, Petitioner has not demonstrated by preponderant evidence that she experienced residual effects for more than six months.

### Conclusion

**Petitioner has failed to establish that the statutory severity requirement is satisfied. Accordingly, this case is DISMISSED for insufficient evidence. The Clerk of Court shall enter judgment accordingly.[6]**

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master